HILDENE OPPORTUNITIES MASTER
FUND, LTD., et al.,

      Plaintiffs,

      v.

HOLATA MICCO, LLC, et al.,

      Defendants.

No. 18 CV 1758

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Hildene Opportunities Master Fund and Hildene Opportunities Master Fund II hold debt securities issued by Leaders Group, a bank holding company. Leaders Group, now insolvent, has defaulted on the interest payments it owes to the trust. Hildene claims that Leaders Group's directors executed a plan to benefit its insiders and evade Leaders Group's obligations to its creditors, first by diluting Leaders Group's own shares in the bank and then by facilitating an unreasonable foreclosure sale of the shares to Holata Micco, a secured creditor controlled by Leaders Group insiders. Hildene sued Holata Micco and Leaders Group's directors over the dilution and foreclosure. Defendants move to dismiss the complaint. For the reasons explained below, the motion is granted in part, denied in part.

## I.    Legal Standards

A complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I accept the facts alleged in the

complaint as true and draw reasonable inferences from those facts in Hildene's favor, but I do not accept as true the complaint's legal conclusions. *Id*. at 678–79. I consider the complaint, exhibits attached to the complaint, and, if they are central to the claims, documents referenced by the complaint. *Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018).

Hildene's allegations of fraud or mistake must be stated with particularity. Fed. R. Civ. P. 9(b). Plaintiffs must describe "the who, what, when, where, and how" of the fraud, though precisely how much information is required for each of those descriptions varies depending on the facts of a case. *Webb v. Frawley*, 906 F.3d 569, 576 (7th Cir. 2018). Plaintiffs are required to conduct their own careful pretrial investigations to "inject[ ] precision and some measure of substantiation into their allegations of fraud." *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 840 (7th Cir. 2018) (citation omitted).

## II. Facts

Leaders Group is a privately held bank holding company that once owned all of the equity in Leaders Bank. [6] ¶¶ 3, 13.[1] In 2004, Leaders Group set up a trust to issue trust preferred securities, or TruPS. [6] ¶ 2. TruPS are a way bank holding companies can raise capital. [6] ¶ 30. Instead of the company issuing shares to investors directly, it opens a trust, and the trust buys debentures, or junior subordinated notes, issued by the company. Investors buy shares of the trust—the

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings. Facts are taken from the amended complaint, [6].

TruPS—and the terms of the TruPS mirror the terms of the debentures. As the bank holding company makes payments to the trust on the notes, the trust passes funds along to the TruPS investors in the form of dividends. *See In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 827 (Del. Ch. 2012) (explaining the TruPS structure). The benefit of this structure is that the bank holding company can treat the TruPS as debt for tax purposes (allowing it to deduct payments to the trust as interest payments) but as equity for regulatory capital requirements. [6] ¶ 31. Here, Leaders Group entered into an indenture with U.S. Bank National Association, the trustee of the TruPS trust, and issued about $5.1 million of debentures. [6] ¶¶ 2, 33. The trust issued 5,000 TruPS to investors, with a liquidation amount of $1,000 each, pursuant to the Declaration of Trust. [1] ¶ 34. Hildene owns all of the TruPS. [6] ¶ 35. Under the indenture, Leaders Group was allowed to defer its quarterly interest payments for up to 20 consecutive quarters, but all of those deferred payments had to be paid at the end of the deferral period, along with accrued interest. [6] ¶ 32.

Leaders Group owned one million shares in Leaders Bank, which represented all of the bank's issued shares and substantially all of Leaders Group's assets. [6] ¶¶ 36–37. In 2008, Leaders Group assigned all these shares to Cole Taylor Bank as security. [6] ¶ 37. Some time later, Leaders Bank issued new shares to the Kelly family. [6] ¶¶ 38–39. These new shares diluted Leaders Group's ownership (without any payment in return) and resulted in the Kelly family owning 63% of the bank's equity. [6] ¶¶ 3, 38–39. The trustee (the holder of the debentures) was not given notice of the new share issuance, and Leaders Group continued to certify that it was in

compliance with the indenture. [6] ¶¶ 40, 42. In 2015, insiders of Leaders Group incorporated Holata Micco. [6] ¶ 50. One month after its incorporation, Holata Micco acquired the debt (and the accompanying liens on the bank shares) that Cole Taylor Bank held against Leaders Group. [6] ¶ 51. Shortly after the acquisition, Leaders Group failed to pay interest on the debentures, and it exceeded the interest deferral allowances under the indenture. The trustee declared an event of default. [6] ¶¶ 45–47. Holata Micco knew of Leaders Group's deadline to pay the deferred interest. [6] ¶ 52.

In the summer of 2017, Holata Micco instituted a "friendly" foreclosure of its liens on the bank shares. [6] ¶ 54. No one hired investment bankers, and Leaders Group did not consult restructuring experts about bankruptcy. [6] ¶ 67. Instead, Leaders Group allowed Holata Micco to go forward with the foreclosure sale. [6] ¶ 68. Holata Micco sent notice of the sale to U.S. Bank's corporate address, but the notice did not say that it was being sent to U.S. Bank because it is the indenture trustee. [6] ¶ 55. The notice said that Holata Micco was foreclosing on a note of about $8.4 million and provided the date for an auction. [6] ¶¶ 55–56. Holata Micco did not hire anyone to manage the sale and relied instead on publishing notice in the Chicago Tribune's Sunday edition for three weeks (one of which fell on the Fourth of July weekend). [6] ¶¶ 59–60. The notice appeared on the fourth page of the "auction mart" section in small font, and it included onerous terms and conditions of the proposed sale. [6] ¶¶ 59–60, 62. Ultimately, Holata Micco was the only party present at the public sale of Leaders Group's bank shares, and its credit bid of $6 million was accepted. [6] ¶ 63.

Holata Micco's winning bid was less than Leaders Bank's tangible common equity of about $26 million. [6] ¶ 65. Because Leaders Group owed Holata Micco more than the $6 million credit bid amount, there were no leftover sale proceeds with which to pay unsecured creditors like Hildene. [6] ¶ 64. Holata Micco did not assume the TruPS obligations. [6] ¶ 70.

In December 2017, with Leaders Group's default on the indenture having gone uncured, the trustee provided it notice of acceleration, and the full amount of the TruPS has been due since then. [6] ¶ 48. Leaders Group has not made any payments toward its obligation, which, together with accrued interest, amounted to about $6.6 million as of February 2018. [6] ¶ 49. In March 2018, Hildene directed the trustee to bring suit to enforce its rights under the indenture and allow Hildene to bring its own suit directly. [6] ¶ 74. The trustee responded by giving Hildene permission to institute an action immediately. [6] ¶ 75.

## III. Analysis

Hildene brings six claims related to the dilution of Leaders Group's ownership of the bank and the foreclosure sale of the bank shares to Holata Micco. The dilution-related claims are a fraudulent transfer claim against the Kellys and a claim against all of Leaders Group's directors for fraudulently concealing a breach of fiduciary duty. The foreclosure-related claims are a breach of fiduciary duty claim against all of the directors and claims against Holata Micco for aiding and abetting the breach, receiving a fraudulent transfer, and conducting a commercially unreasonable sale in violation of the UCC. Defendants move to dismiss all the claims.

## A.    Contractual Bars

Defendants argue that certain of the indenture's provisions bar Hildene's claims. New York law governs interpretation of the indenture. [37-1] § 14.5. *See also Kardolrac Indus. Corp. v. Wang Labs., Inc.*, 135 Ill.App.3d 919, 921 (1st Dist. 1985).

### 1.    No Recourse Provision

Section 13.1 of the indenture provides that no recourse "for the payment of the principal of or premium, if any, or interest on any Debenture, or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture … or because of the creation of any indebtedness represented thereby" can be had against Leaders Group's directors or stockholders. [37-1] at 47. Courts applying New York law have found similarly worded no-recourse provisions to bar only contract claims. *See LaSalle Nat. Bank v. Perelman*, 141 F.Supp.2d 451, 459–62 (D. Del. 2001). And the New York Court of Appeals has said of a similar provision "that it did not and could not cover the future fraudulent acts of the directors." *Small v. Sullivan*, 245 N.Y. 343, 356–57 (1927). *See also Bankers Tr. Co. v. Hale & Kilburn Corp.*, 84 F.2d 401, 405 (2d Cir. 1936).

Most of Hildene's claims are not based on defendants' obligations under or breaches of the indenture. Hildene's claim for the directors' breach of fiduciary duty, for example, is based on the directors failing to take necessary actions when Leaders Group was insolvent and instead allowing the foreclosure sale to go through. No part of that claim hinges on any obligations that the directors had under the indenture. The same is true of the other claims, including those against Holata Micco.

Defendants argue that these claims amount to artfully pleaded contract claims for breach of the indenture, pointing in part to Hildene's statement that it was injured by Leaders Group's inability to repay the TruPS and its representation in a status report that it seeks damages that include interest and principal amounts under the indenture. But Hildene's theory of calculating its damages is not a statement of its theory of liability. Breach of the indenture is not part of most of Hildene's claims, and those claims are not barred by the no-recourse provision.

The fraudulent concealment claim is different. It is a contract claim. The misrepresentations at issue are the no-default certificates that Leaders Group issued to the trust as required by the indenture, despite allegedly breaching the indenture by allowing the dilution to occur. This is a "breach-of-contract allegation[ ] dressed up in the language of fraud." *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 395 (7th Cir. 2011). Because the no-recourse provision bars claims for breaches of the indenture against the directors, the fraudulent concealment claim is dismissed.

### 2. No Action Provision

Section 5.4 of the indenture provides that "[n]o holder of any Debenture shall have any right to institute any suit, action or proceeding for any remedy hereunder," unless certain steps—like providing written notice to the trustee of an event of default and waiting 60 days after notice is issued—are taken. [37-1] at 29. The parties dispute whether this provision applies to Hildene. As Hildene points out, it is not the "holder of any Debenture." The trust holds all the debentures. [49] at 4. Defendants argue that though Hildene itself does not hold a debenture, it "purport[s] to stand in the shoes of the Trust," [50] at 6, though they provide no citation for that characterization

of Hildene's claims. Hildene alleges that it is a creditor of Leaders Group, [6] ¶ 106, not that it is standing in the trustee's shoes. As a creditor, Hildene can bring derivative claims on Leaders Group's behalf and bring fraudulent transfer claims directly.

Because Hildene alleges that it is a creditor and does not hold a debenture, the no-action provision does not apply to its claims. Even if the no-action clause did apply to Hildene, it would not bar the type of claims that it asserts here. Like the no-recourse provision, the no-action clause would only bar claims arising from the indenture. *See Howe v. Bank of New York Mellon*, 783 F.Supp.2d 466, 473–74 (S.D.N.Y. 2011).[2]

Hildene argues that it is authorized to bring suit under § 14.11 of the indenture, which allows TruPS holders to "institute legal proceedings directly against the Company" to enforce the trustee's rights under the indenture when the trustee does not do so itself. [37-1] at 49. I agree with defendants that § 14.11 does not authorize Hildene's claims because they are not against Leaders Group, and I would add that Hildene is not seeking to enforce the trustee's rights under the indenture. But because I find that Hildene's alleged status as a creditor allows it to bring its claims, it need not resort to § 14.11.

---

[2] Hildene also argued that even if § 5.4's procedural requirements applied to it, the trustee waived those requirements. But I am not convinced that the trustee can unilaterally waive compliance with them. *See Fed. Hous. Fin. Agency v. UBS Real Estate Securities, Inc.*, No. 651282/12, 2016 WL 4039321, at *3 (N.Y. Sup. Ct. 2016).

### 3. *Right to Sell*

Section 15.8 provides that senior secured creditors can sell collateral at any time "without the consent of or notice to the Trustee or the Security holders." [37-1] at 53. Defendants argue that this provision expressly permitted the foreclosure sale, and Hildene's claims should therefore be dismissed. But, as Hildene explains, "the crux of the Complaint is not that the sale of the Bank Shares occurred, but rather, that it was done in a manner in furtherance of tortious conduct and that was not commercially reasonable." [39] at 15. This further underscores why Hildene's claims are more than recast contract claims.

### B. **Derivative or Direct Claims?**

Hildene contends that its breach of fiduciary duty claim against the directors and its UCC claim against Holata Micco are brought derivatively on behalf of Leaders Group and that the others are direct claims brought on its own behalf. Defendants argue that they are all direct claims, while noting that Hildene "purportedly bring[s] every cause of action on behalf of the Trustee." [44] at 3.

Derivative actions are often brought by shareholders, who bring claims "on behalf of a corporation to seek relief for injuries done to that corporation, where the corporation either cannot or will not assert its own rights." *Davis v. Dyson*, 387 Ill.App.3d 676, 682 (1st Dist. 2008). When a corporation is insolvent, its creditors are also allowed to bring derivative claims on its behalf. *Caulfield v. Packer Grp., Inc.*, 2016 IL App (1st) 151558, ¶ 42, 56 N.E.3d 509, 519 (1st Dist. 2016). "[D]erivative claims always and only belong to the corporation on whose behalf they are brought, and any damages awarded in a derivative suit flow exclusively and directly to the

corporation, *not* to the nominal plaintiffs." *Stevens v. McGuireWoods LLP*, 2015 IL 118652, ¶ 15, 43 N.E.3d 923, 928 (2015) (emphasis in original). In Illinois, "[w]hether an action is derivative or direct … requires a strict focus on the nature of the alleged injury, *i.e.*, whether it is to the corporation or to the individual shareholder that injury has been done." *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill.App.3d 58, 62 (1st Dist. 2002). Put another way, the question is whether "the 'gravamen' of the pleadings states injury to the plaintiff upon an individual claim as distinguished from an injury which indirectly affects the shareholders or affects them as a whole." *Zokoych v. Spalding*, 36 Ill.App.3d 654, 663 (1st Dist. 1976).[3]

Defendants argue that because all the claims complain of actions "'designed to harm Leaders Group's creditors'—not Leaders Group," the claims are all direct in nature. [37] at 15. But Hildene's claims stem from the dilution and foreclosure sale, events that indirectly injured Hildene because they decreased the value of Leaders Group. Any harm to Hildene is shared equally by other stakeholders in the company. For that reason, Hildene's breach of fiduciary duty claim, the claim against Holata Micco for aiding and abetting the breach (even though Hildene labels that claim a direct one), and the UCC claim[4] are derivative. Though the fraudulent transfer claims

---

[3] Though these cases refer to shareholders, Hildene does not argue that the standard differs for claims brought by creditors.

[4] The UCC claim—brought derivatively against Holata Micco on behalf of Leaders Group— contains confusing allegations that it "seeks to remedy wrongdoing committed by the Individual Defendants" and that the "individual defendants" conducted the sale. [6] ¶¶ 115, 120. But the complaint's other allegations demonstrate that it was Holata Micco that conducted the sale in a manner that harmed Leaders Group, [6] ¶¶ 55, 59, 69, so I accept Hildene's characterization of the claim as a derivative one against Holata Micco.

are also based on harm to Leaders Group that indirectly affected Hildene, the fraudulent transfer statute expressly gives creditors the ability to bring suit for their injuries, *see* 740 ILCS 160/8, so Hildene may pursue them directly.[5]

Defendants point out that in its derivative claims, Hildene seems to seek damages on its own behalf. Hildene does allege that it was damaged. *See* [6] ¶ 96. But the nature of the injury is derivative, so it is still a derivative claim, and any recovery belongs to Leaders Group. *See Stevens*, 2015 IL 118652, ¶ 15, 43 N.E.3d at 928.

### C.    Direct Claims – Fraudulent Transfer

Hildene's only direct claims are its fraudulent transfer claims. A fraudulent transfer can occur when the debtor makes the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5(a)(1). The parties did not discuss the factors that the statute offers to determine whether the debtor made the transfer with the requisite intent. 740 ILCS 160/5(b).[6] The requisite intent can also be implied when the transfer is made "without receiving a reasonably equivalent

---

[5] Hildene characterized its fraudulent concealment claim against the directors (barred by the no-recourse provision discussed above) as a derivative claim brought on behalf of Leaders Group, but the allegations are that "Leaders Group fraudulently concealed the fraudulent transfer from the Trustee." [6] ¶ 143. The alleged injury was inflicted on the trustee, not Leaders Group, so Hildene could not bring it on Leaders Group's behalf.

[6] The factors to consider are whether: "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5(b).

11

value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 740 ILCS 160/6(a). Rule 9(b)'s heightened pleading standard applies to both kinds of fraudulent transfer claims. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997) (applying Rule 9(b) to constructive fraudulent transfer claim).

### 1. *Dilution*

Hildene brings a fraudulent transfer claim against the Kellys based on the dilution, but Hildene has not alleged that Leaders Group (the debtor) made any transfer with respect to the dilution. As defendants argue, the complaint alleges that Leaders Bank, not Leaders Group, issued the shares to the Kellys. [6] ¶ 129. Even if I were persuaded that Leaders Group could be held accountable for the bank's transfer if it caused it, *see DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer*, 869 F.3d 839, 843 (9th Cir. 2017), the complaint gives me nothing from which to infer that Leaders Group caused the transfer other than the mere fact that it was the sole shareholder of the bank. That is not sufficient. *See id.* at 841 (stating that the debtor "caused" his solely-owned company to transfer assets).

Defendants also argue that Hildene did not provide enough detail in its allegation that Leaders Group was insolvent at "all relevant times." [6] ¶ 80. This argument is well taken with respect to the dilution, since the complaint only generally alleges that the dilution happened "[s]ome time after 2008." [6] ¶ 38. So though the complaint alleges that Leaders Group was insolvent when the dilution occurred, [6]

¶ 133, there is no concrete indication of when that was. Rule 9(b) requires more for an allegation of timing.

For these reasons, the dilution-based fraudulent transfer claim against the Kellys is dismissed.

### 2. Foreclosure

Hildene brings both kinds of fraudulent transfer claims against Holata Micco for the foreclosure sale. Defendants argue that Hildene has not sufficiently alleged Leaders Group's intent to defraud for a claim under 740 ILCS 160/5(a)(1). Some of the statutory considerations weigh in favor of an inference of intent—the transfer was made to an insider (Holata Micco), the sale was made after the indenture trustee declared an event of default, the transfer was of most of Leaders Group's assets, and the consideration it received is alleged to be short of the shares' fair value. But the statutory factors are "merely considerations" and are not dispositive. *Lindholm v. Holtz*, 221 Ill.App.3d 330, 334 (2nd Dist. 1991).

The complaint's factual allegations about the foreclosure do not give rise to an inference of fraudulent intent on Leaders Group's part. Though the transfer was to an insider, the complaint does not allege that the majority of directors were interested in the transaction or beholden to the insiders. The transfer occurred through the foreclosure on a lien, and the complaint does not allege that the lien was not valid, that Holata Micco did not legally acquire the lien, or that its foreclosure was not justified. Put together, the complaint alleges that Leaders Group—controlled by a disinterested and independent board—defaulted on a secured loan, Holata Micco enforced its legal right to foreclose on the security, and Leaders Group allowed the

foreclosure to occur. Though Hildene alleges that the foreclosure was conducted in a commercially unreasonable manner, it alleges that Holata Micco conducted the sale. *See* [6] ¶¶ 55, 57, 59, 69; [39] at 10. That Leaders Group "did nothing other than to look the other way" during the foreclosure, [6] ¶ 68, does not give rise to an inference of fraudulent intent by the debtor. Even if the Leaders Group insiders who controlled Holata Micco harbored a devious intent to cheat Leaders Group's creditors and acquire its assets for themselves at an unfairly low price, that intent cannot be imputed to Leaders Group, which was controlled by directors who were disinterested and independent from Holata Micco.

The complaint alleges that "Leaders Group and Holata Micco failed to comply with the notice procedures in the Trust Agreement in order to prevent [Hildene] from participating in the sale," [6] ¶ 111, but defendants point out that the indenture does not require senior creditors to provide notice to the trustee or TruPS investors before foreclosing on their security, [37-1] § 15.8, and Hildene does not cite a provision requiring Leaders Group to notify Hildene of the foreclosure. The complaint also alleges that "Leaders Group was well aware of the successor clause and sought to structure the Bank Shares sale to avoid having to comply with the TruPS indentures," [6] ¶ 111, but that allegation is a conclusory one. Hildene has not stated a transfer with intent to defraud claim.

Proof of fraudulent intent is not required to establish constructive fraud. *A.G. Cullen Const., Inc. v. Burnham Partners, LLC*, 2015 IL App (1st) 122538, ¶ 27, 29 N.E.3d 579, 586 (1st Dist. 2015). The complaint adequately alleges that the

foreclosure auction was scheduled for July 19, 2017, and at that time Leaders Group was insolvent—a sufficiently particular allegation of the timing of insolvency. [6] ¶¶ 55, 108. Though defendants argue that "a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale," 740 ILCS 160/4(b), Hildene alleges that the bank share foreclosure was not "regularly conducted" but rather commercially unreasonable. The complaint alleges that Holata Micco's credit bid of $6 million was "substantially less than the fair market value of the Bank Shares, based on Leaders Bank's approximately $26,000,000 in tangible common equity and other factors." [6] ¶ 65. The bank's tangible common equity at least makes it plausible that the credit bid was below the value of the shares. And though it seems doubtful that Hildene, an unsecured creditor, would have recovered anything even if the foreclosure had been conducted more favorably to creditors, it is at least plausible that a sale commensurate with the bank's value could have generated something for Hildene—it has alleged damages.

D.    **Derivative Claims**

1.    *Demand Futility*

Derivative actions have a demand requirement that obligates the plaintiff to demonstrate that the entity whose rights she seeks to enforce rejected the opportunity to bring suit after receiving suitable demand. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95–96 (1991). "The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests

will be promoted by not insisting on such right." *Id.* at 96 (cleaned up). Its function is to "delimit[ ] the respective powers of the individual shareholder and of the directors to control corporate litigation." *Id.*

Federal Rule of Civil Procedure 23.1 requires plaintiffs in derivative actions to "state with particularity (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." "[A]lthough federal law governs the degree of detail that the plaintiff must furnish when it gives its 'reasons for not obtaining the action or not making the effort,' state law will determine whether those reasons are sufficient." *Westmoreland Cty. Employee Ret. Sys. v. Parkinson*, 727 F.3d 719, 722 (7th Cir. 2013) (citation omitted). Because Leaders Group is an Illinois corporation, Illinois law governs whether demand is excused, and Illinois follows Delaware law on the issue. *See In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 803 (7th Cir. 2003); *Spillyards v. Abboud*, 278 Ill.App.3d 663, 675 (1st Dist. 1996).

Hildene argues that the demand requirement does not apply to it because it is a creditor, not a shareholder. Hildene points out that Rule 23.1 says it applies "when one or more shareholders or members of a corporation" bring a derivative action. Nevertheless, demand futility is a substantive—not a procedural—requirement, so whether it applies to creditors is a matter of state law. *Westmoreland*, 727 F.3d at 722. Some non-binding cases assume that demand futility applies to creditor-derivative suits. *See In re Hartford Court Dev., Inc.*, No. 17 BK 01356, 2018 WL

604540, at *2 (Bankr. N.D. Ill. Jan. 25, 2018); *In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992).

Hildene offers no reason why the demand requirement should not apply to creditors who bring derivative actions, which are equitable in nature. Shareholders are permitted to enforce a corporation's rights because "they are the ultimate beneficiaries of the corporation's growth and increased value." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). But when a corporation is insolvent, "its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." *Id.* The incentives of shareholders and creditors are the same, *id.* at 102, so the same safeguards should apply. The policies behind the demand requirement for shareholders apply with equal force to creditors—directors are charged with managing a corporation's affairs and the decision to litigate belongs in their hands, absent special circumstances. For that reason, the demand requirement applies to derivative actions brought by creditors. *See Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 795–96 (Del. Ch. 2004) (providing arguments for and against applying the demand requirement to creditors, without deciding the issue).

Hildene argues that demand should be excused as futile. One argument it raises is that demand is futile because Hildene contacted John Gleason, one of Leaders Group's directors and its CEO, and he said Leaders Group disputes Hildene's allegations and refused to provide information. [6] ¶ 86. This argument reflects a misunderstanding of demand futility. *See Blasband on Behalf of Danaher Corp. v.*

*Rales*, 772 F.Supp. 850, 856 (D. Del. 1991), *vacated on other grounds*, 971 F.2d 1034 (3d Cir. 1992) ("The test, as articulated by the Delaware courts, is not whether it appears unlikely on the evidence that the board will respond affirmatively to the demand … Rather, the question is whether directors have the legal capacity to consider the demand disinterestedly." (citation omitted)). Demand is futile when particularized factual allegations create a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).[7] The demand-futility "analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction." *Khanna v. McMinn*, No. CIV.A. 20545-NC, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006).

a. Disinterested and Independent Directors

A disinterested director "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing." *Aronson*, 473 A.2d at 812. With respect to the dilution of Leaders Group's bank shares, the complaint alleges that two of Leaders Group's twelve directors have the last name Kelly (the same name as the family that received the newly issued shares),

---

[7] Both parties apply the *Aronson* test, so I assume Hildene's claims are based on the directors' actions or conscious inaction, not actions that they were not aware they should take. Otherwise, the test articulated in *Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993), which applies to circumstances "where the subject of the derivative suit is not a business decision of the board," would apply. *See Abbott*, 325 F.3d at 806.

but that is not a majority of the directors.[8] With respect to the foreclosure of the bank shares, the complaint alleges that two of Leaders Group's twelve directors are principals of Holata Micco who stood to gain from the sale—also not a majority. So the majority of directors were disinterested in both transactions.

An independent director is one whose "decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Id*. at 816. Hildene argues that "Directors of Leaders Group are related (*i.e.*, siblings)," pointing to allegations about the two Kelly directors and the two Gleason directors, which still leaves the majority of directors independent. Hildene also asserts that the directors "are beholden to one another through a myriad of family and business relationships related to Leaders Group and Holata Micco" and that the Kelly family holds influence over Leaders Group. [39] at 19. Neither of those assertions are found in the complaint, nor are they supported by factual allegations. *See Aronson*, 473 A.2d at 815. Though Hildene asks me to take judicial notice of the Leaders Group organizational chart as proof of the Kelly family's influence over the directors, it establishes only that the Kelly family is a minority shareholder of Leaders Group and does nothing to suggest that any of the directors are beholden to the family.[9]

---

[8] I dismissed Hildene's only derivative claim relating to the dilution transaction—the fraudulent concealment claim—above, on other grounds. But for the sake of completeness, I will address demand futility with respect to the dilution anyway.

[9] Hildene cited to a link that does not lead to the organizational chart. From the title that it gave, I assume it meant to refer to the one available at https://www.chicagofed.org/~/media/others/banking/financial-institution-reports/fr-y-6-pdf-files/2016/l/leaders-group-inc-2856014-2016.pdf.

Because Hildene has not alleged a reasonable doubt that the majority of directors were disinterested and independent, it must rely on *Aronson*'s second test for demand futility.

### b. Business Judgment Rule

The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. However, the business judgment rule does not protect directors against allegations of "bad faith, fraud, illegality or gross overreaching." *Stamp v. Touche Ross & Co.*, 263 Ill.App.3d 1010, 1016 (1st Dist. 1993). "The totality of the complaint's allegations need only support a reasonable doubt of business judgment protection, not 'a judicial finding that the directors' actions are not protected by the business judgment rule.'" *Abbott*, 325 F.3d at 809 (citation omitted)).

Hildene states that the directors did not exercise due care, but there is nothing in the complaint to suggest that the directors' actions are attributed to a lack of care, diligence, or skill. Instead, Hildene alleges that the directors' actions were done in bad faith. "If due care is exercised … then the business judgment rule is applicable to preclude director liability for erroneous judgments absent conduct involving fraud, illegality or conflict of interest." *Stamp*, 263 Ill.App.3d at 1016. In other words, the business judgment rule applies unless the directors breached their fiduciary duty of loyalty.

The fiduciary duty of loyalty requires directors "to administer the corporate affairs for the common benefit of all the stockholders and exercise their best care,

skill and judgment in the management of the corporate business *solely in the interest of the corporation.*" *Id.* at 1015 (citation omitted) (emphasis in original). "[T]he intentional dereliction of duty or the conscious disregard for one's responsibilities [constitutes] bad faith conduct, which results in a breach of the duty of loyalty." *Westmoreland*, 727 F.3d at 726 (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del.Ch.2008)). *See also In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) (director acts in bad faith when she intentionally acts with a purpose other than protecting the best interests of the corporation, intends to violate the law, or intentionally fails to act in the face of a known duty to do so). Because the majority of directors did not have a conflict of interest, the question here is whether the complaint's allegations adequately accuse them of acting in bad faith.

Hildene has not alleged facts to make a bad-faith claim plausible for the dilution of shares. As I explained above, Hildene did not allege that the directors took any action or inaction with respect to the dilution, but even if the directors caused the dilution, the allegations do not suggest bad faith. The majority of the directors were disinterested and independent, and plaintiffs' factual allegations do not give rise to an inference that any of them were intentionally shirking known duties or had in mind an interest other than the corporation's. The only dilution-related allegation that Hildene points to as demonstrating bad faith is that the directors "did not permit Leaders Group to market the equity in the Bank." [6] ¶ 41. It is unaccompanied by any allegation that the directors knew they had an obligation to market the equity or

facts from which to infer that they did not market the equity because they were motivated by something other than Leaders Group's interests.

Nor has Hildene alleged a plausible claim for bad faith in the foreclosure sale. Again, there are no allegations that the directors knew of any obligations that they intentionally ignored or to suggest that the directors intended to do anything illegal or with a nefarious purpose. Hildene cites to the allegation that the directors "took no action for years to try to maximize the value of its assets," [6] ¶ 54, but that quite general allegation does not suggest that the directors knew they had an obligation to take any particular action. And the other allegations Hildene relies on are things the directors "could have" done—like filed for bankruptcy, hired an investment banker, or other unknown "[a]lternatives." [6] ¶¶ 6, 66. If the directors intentionally flouted a known obligation to take those actions or if their inaction is attributed to an impermissible purpose, then the business judgment rule would not protect them, but otherwise, the business judgment rule does not allow Hildene to substitute its judgment for that of the directors.

Hildene has not established either *Aronson* test, so its failure to meet the demand requirement is not excused, and the derivative claims are dismissed.

### 2. Merits

Though I need not reach them, I briefly address some of the merits arguments regarding the derivative claims. Defendants argue that the business judgment rule defeats Hildene's breach of fiduciary claim as a matter of law. Though Hildene does not argue it, the business judgment rule may be an affirmative defense that a complaint generally need not anticipate. *See Fed. Deposit Ins. Corp. v. Giancola*, No.

13 C 3230, 2014 WL 1056643, at *3 (N.D. Ill. Mar. 19, 2014). Anyway, dismissal would be appropriate for the same reasons that demand is not excused as futile—the complaint's allegations of the directors' choices are unaccompanied by facts showing that those choices were made in bad faith. As for the aiding and abetting claim, Holata Micco cannot be liable for aiding and abetting a breach of fiduciary duty that did not occur, so that claim's fate is tied to the unsuccessful breach of fiduciary duty claim.

Defendants also challenge Hildene's claim that the foreclosure sale violated the UCC. The UCC requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." 810 ILCS 5/9-610(b). A sale is conducted in a commercially reasonable manner if it is made "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." 810 ILCS 5/9-627(b). Defendants argue that Hildene only relies on the allegedly insufficient price to support its claim, but Hildene alleges that the advertisements used to publicize the foreclosure sale were a commercially unreasonable method of selling bank equity. *See* [6] ¶ 119 ("Bank equity is not typically sold through newspaper advertisements."). Contrary to defendants' assertion, that newspaper ads are not the normal commercial practice for selling bank equity is not a conclusion, it is a fact accepted as true at this stage. That

makes it plausible that the sale was commercially unreasonable, but this derivative claim is dismissed for the reasons discussed above.

## IV.  Conclusion

Defendants' motion to dismiss [37] is granted in part, denied in part. Hildene can pursue its constructive fraudulent transfer claim against Holata Micco, but its other claims are dismissed without prejudice.[10]

ENTER:

Manish S. Shah
United States District Judge

Date: March 12, 2019

---

[10] "District courts routinely do not terminate a case at the same time that they grant a defendant's motion to dismiss; rather, they generally dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint." *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008).